## Sankey *versus* McElevey, Administrator.

1. The relation of debtor and creditor is not one of trust or confidence so as to make it the duty of the debtor to disclose to the creditor the fact or amount of his indebtedness.

2. Mere silence or concealment by the debtor without affirmative misrepresentation will not toll the running of the statute of limitations.

3. Where, however, a debtor by actual fraud keeps his creditor in ignorance of the cause of action, the statute of limitations does not begin to run until the creditor had knowledge, or was put upon inquiry with means of knowledge that such cause of action had accrued.

4. The voluntary disclosure by a debtor to his creditor of partial information concerning the debt, unaccompanied by positive misrepresentation, does not impose upon him the duty of imparting full information relating thereto.

5. Where a debtor disclosed to the personal representatives of his creditor the fact of his indebtedness, his omission to state its amount is not such fraudulent concealment as will toll the statute of limitations.

6. The procuring by a debtor of the evidence of his indebtedness (a promissory note) from the custody of a third party, after the debt was barred by the statute of limitations, and the giving of a receipt therefor without an acknowledgment of the debt, will not revive the cause of action.

October 11th 1883.   Before GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.   MERCUR, C. J., and PAXSON, J., absent.

ERROR to the Court of Common Pleas of *Lawrence county:* Of October and November Term 1883, No. 150.

Assumpsit, by John McElevey, Administrator of Robert McElevey, deceased, against David Sankey, to recover the amount of a promissory note given by said Sankey to Robert McElevey on April 15th 1848, for $1545, with interest thereon. Pleas, non assumpsit, payment with leave, etc., and the statute of limitations.

On the trial, the following facts appeared: On April 15th 1845, David Sankey gave the note in question to Robert McElevey to secure the payment of a loan made to him by said McElevey. The note was afterwards placed in the hands of one James Power for safe keeping, through whom it came into the custody of T. J. Power.   Robert McElevey died intestate in 1849, and his brother John was appointed administrator of his estate.   He left surviving him a mother, Sarah McElevey, who was the sister of David Sankey, and some brothers and sisters.   The defendant testified that prior to Robert's death he had agreed with Robert by letter that he (Sankey) should convey to Amanda, Robert's sister, a tract of land, which he, the defendant, had previously purchased at sheriff's sale for $615,

[Sankey *v.* McElevey.]

in satisfaction of the note in question.   After Robert's death, Sankey, in pursuance of this alleged agreement, conveyed the tract in question to Amanda McElevey for the nominal consideration of $1,000, which was inserted in the deed by Sankey. Amanda went into possession, and she and those claiming under her have held it ever since.   At the time of the delivery of this deed to Amanda, Sankey had an interview with Sarah McElevey, in the presence of John, Amanda, and the other children.   At the present trial, the plaintiff and defendant were the only surviving participants in that interview.  Sankey testified :

Q.   State whether you explained to them—John and these others in John's presence, how you came to make this deed ? A.   I did, fully, as I understood it myself, and handed them the papers.

Q.   Was John present ; was it ever talked of between you and John ?   A.   Yes, sir.

Q.   What explanation did you give John as to how this deed was made ?   A.   That I made it in pursuance of an arrangement with Robert, in consideration of the money I borrowed of him, Robert McElevey, by arrangement with him.

Q.   State whether or not you communicated that you made the deed at the request of Robert McElevey, or at his suggestion ?   A.   Yes, sir ; no one else could have suggested anything of that kind.

Q.   From the making of this deed, state whether or not the debt was paid ?   A.   Yes, sir ; it was and so understood by all the parties at the time.

Q.   Did you ever tell John McElevey how much money you got from Robert?   A. Yes, sir; at the time I made the deed to Amanda.

Q.   Do you state that you told John McElevey or anyone in his presence how much money you got from Robert ?   A. Yes, sir, I did.

The same witness further testified :

Q.   Did you ever make any settlement at all with John McElevey as administrator of Robert ?   A.   No, sir, never.

Q.   You say you never communicated to him the fact that you gave Robert the note?   A.   I never did.

The plaintiff, John McElevey, testified :

Q.   State whether you had any conversation at any time with David Sankey in relation to this deed ?   A.   Yes, sir.   I had, or he rather with me.   I got the information from him.

Q.   What did Sankey say to you ?   A.   He made the remark to me shortly after I took out letters of administration that he had borrowed a certain amount of money, not naming the amount, from my brother, saying it was the desire of Rob-

[Sankey *v.* McElevey.]

crt that he should make the title to Amanda for the considera-
tion of $825 or $850 he said to me, for the lot; or the same
amount which he claimed was bid off in Mercer county; that
was the amount.

Q. Robert McElevey was to have credit for it? A. Yes,
sir.

Q. With the amount? A. Yes, sir, it was $825.50 Mr.
Sankey said to me. That was to be the amount that he was to
deed the lot to Amanda for.

Q. How did the amount come to be mentioned or alluded
to in that conversation? How did he come to refer to the
amount in dollars and cents? A. I don't recollect that that
was the amount. He said he had borrowed some money from
Robert, not naming the amount. This was in 1849, and the
deed was not made out for more than a year after that, and the
deed was made in my presence to me and signed in my pres-
ence by his wife and him. I found the deed to be a thousand
dollars, and I says to Mr. Sankey, " This cannot be possible, for
I got information from you that it was to be $825 or $850, or
whatever the amount was that was knocked down by the sher-
iff in Mercer county," and I took exception to putting it at
$1,000 at the time. He gave me no information at all.

Q. Did he say anything about how much he had got from
Robert McElevey? A. No, sir, he never told me or any one
else, and I guess he didn't know himself.

Q. Did he say anything about having a note of Robert?
A. No, sir; no one appears to know that but Power and him-
self.

On April 15th 1858, David Sankey met T. J. Power, and
asked him for the note in question, as he wished it " for the
purpose of making a settlement and settlement of an account."
Power gave him the note, and took the following receipt
therefor:

" Rec'd of T. J. Power, Esq., adm'r of the estate of J. M.
Power, dec'd, my own note payable to the order of R. W. Mc-
Elevey, dated April 15, 1848, for $1,545 to make a statement
and settlement of the account between us.

" 15th April, 1858.                          DAVID SANKEY."

On May 4th 1882, this suit was brought.

The plaintiff presented the following point:

1. That the receipt given to T. J. Power, bearing date
April 15th 1858, for the note of David Sankey to Robert Mc-
Elevey, dated April 15th 1848, is evidence of the recognition
of the debt, and a renewal of the promise that the note should
be settled and paid, and takes the obligation out of the statute
of limitations.

Answer. Refused.

[Sankey *v.* McElevey.]

The defendant presented the following points:

7. Under the evidence of this case the bar of the statute of limitations was complete before the time when it is alleged the defendant got possession of the said note from Thomas J. Power, to wit: on the 15th day of April 1858.

Answer. This we affirm; the bar of the statute of limitations was complete, and as we have already instructed you if the matter had just remained so, and the defendant had neither attempted nor offered to pay, nor made any declaration with regard to the indebtedness, he was then relieved; and the statute of limitations had run, and recovery was completely barred. [But as we have already instructed you that prior to that in 1850 he entered into negotiations for the payment of this debt, and then it was that we say he should have told the entire truth, and made known all the facts; and if material facts were then concealed by him, with the fraudulent intent of avoiding the payment of a just debt, it would prevent the running of the statute afterwards."] Exception. (Third assignment of error.)

" 8. That the statute of limitations began to run from the time that the right of action accrued, without regard to want of knowledge of such right by the plaintiff, unless it was prevented by a technical trust or the actual fraud of the defendant, and there is no evidence of either in this case.

Answer. The forepart of this proposition we affirm and submit it to you on whether or not there was actual fraud. The latter portion in which we are asked to say to you that there is no evidence of actual or technical fraud we refuse; we think there is evidence of actual fraud, and that evidence we submit to you." Exception. (Fourth assignment of error.)

The court charged the jury that the plea of payment had not been sustained by the evidence (first assignment of error), that the receipt given by Sankey to Power, when he borrowed the note, was not a sufficient recognition of an indebtedness to take the case out of the statute of limitations; that the turning point in the case was the question of fact, which was submitted to the jury, whether Sankey in the interview with Sarah McElevey and the others "divulged the whole truth;" that it was Sankey's duty if he gave any information concerning the indebtedness, to state then and there the amount of such indebtedness due from him to the estate of Robert McElevey; that if he failed to so divulge the entire amount of the indebtedness, and if such concealment was with the fraudulent intent of avoiding the payment of any portion of said note, then Sankey was guilty of such fraud as would take the case out of the statute of limitations; that if the jury found otherwise, then the statute would be a complete bar to the plaintiff's claim

and the jury should find a verdict in favor of the defendant. (Second assignment of error.)

Verdict for the plaintiff for $2,295.85, and judgment thereon. The defendant thereupon took this writ of error, assigning for error the instructions of the court as above, and the answers to his seventh and eighth points.

*D. B. Kurtz*, (*E. T. Kurtz* with him), for plaintiff in error.—A debtor is under no legal obligation to remind his creditor of the existence or amount of his obligation. Therefore, mere failure to disclose the truth is not such fraud, as will toll the statute of limitations, unless there is some relation of trust or confidence, that imposes an obligation to disclose : Eichelberger *v.* Barnitz, 1 Yeates 307, 312, note ; Martin *v.* Pennock, 2 Barr 376 ; Cornelius *v.* Molloy, 7 Barr 293 ; Harris *v.* Tyson, 12 Harris 347. These parties sustained no such relation of trust or confidence as imposed on the defendant the legal duty to inform the plaintiff the amount of the debt, even if the plaintiff was ignorant of it. Their relation was simply that of contracting parties, which imposed no obligation of discovery of that fact. They are parties to a suit at law, in a court of law, and this defence is purely of a legal character. The fraud alleged to toll the statute is predicated on the silence or neglect of the defendant to give the plaintiff information, not on the fact that he did or said anything to mislead or deceive him, or to prevent him from ascertaining the truth. This at most would be but constructive fraud, which will not avoid the statute. It is well settled that the fraud and concealment necessary to take the case out of the statute must be positive and actual : Farnam *v.* Brooks, 9 Pickering 212 ; Cole *v.* McGlathry, 9 Greenl. 131. The statute of limitations is now held to be applicable to all cases, excepting those involving technical trusts or actual fraud : Hanna *v.* Meconkey's Ex'r, 11 Phil. 549 ; Campbell's Adm'r *v.* Boggs, 12 Wright 524 ; Fleming *v.* Culbert, 10 Wright 498 ; Downey *v.* Garard, 12 Harris 52 ; Stephens *v.* Downey, 3 Smith 424 ; Morrell *v.* Trotter, 12 W. N. C. 143.

*R. B. McComb*, for the defendant in error.

Mr. Justice GREEN delivered the opinion of the court, November 5th 1883.

This action was brought in 1882 upon a note given on April 15th 1848, thirty-four years after the cause of action accrued. To the plea of the statute of limitation it was replied that the defendant had been guilty of such fraud as to prevent its operation as a bar. The alleged fraud consisted in withholding full

information as to the true amount of the debt.   The payee of the note, R. W. McElevey died in 1849.   Administration upon his estate was granted on August 22nd 1849 to his brother John McElevey, the present plaintiff.   On June 25th 1850, David Sankey, the defendant, executed and delivered a deed to Amanda McElevey, a sister of the payee, for lot No. 39 in New Castle, for the nominal consideration of $1000, alleging that the conveyance was made in pursuance of a contract between him and the payee that he would convey the lot to Amanda in discharge of indebtedness for money borrowed by the defendant from the payee.   The defendant alleged, and testified that he informed the parties, including Amanda and John and their mother Sarah, of the whole transaction, stating the whole amount of the debt.   At the time of the trial, and long before this action was brought, Sarah the mother, and Amanda were dead.   John being alive testified that the amount of the loan was not stated by the defendant when the deed was made, and the court left to the jury the question whether the defendant's allegation on that subject was true, charging that if it was not, his conduct was such a fraud as would toll the statute.   In this we think there was error.   The learned judge charged the jury that there was no obligation on the part of David Sankey to make known the fact of his indebtedness, and that if he had said nothing the action would have been barred.   But he said if the defendant did speak at all he was bound to tell the whole truth, and for not doing so he forfeited the protection of the statute.   It is difficult to understand upon what principle this theory can be sustained.   We are not furnished with a single authority either by the learned judge of the court below, or by the counsel for the plaintiff, the defendant in error, in support of this proposition, and it seems untenable.   If it be conceded, as indeed it is, and must be, that the relation of debtor and creditor merely, is not a relation of trust and confidence, imposing upon the debtor the duty of information either to the creditor or his representative, of the fact and extent of his indebtedness, and therefore that he is guilty of no fraud if he withholds all information, how can he be guilty of fraud if he does impart some information and withholds only a part ? To so hold would seem to be making the less greater than the whole.   According to the doctrine of the court below the defendant was under no obligation to inform the plaintiff of the fact of his indebtedness to the intestate, and if he gave no information at all, said nothing whatever upon the subject, he was guilty of no fraud, and his plea of the statute would be a perfect bar.   But if he did tell the plaintiff that he owed the intestate, but did not tell him how much he owed him, then he was guilty of fraud and can not have the benefit of the statute.

[Sankey v. McElevey.]

In this case the plaintiff admits that in 1850 when the defendant made the deed to Amanda for the lot, he did tell him he had borrowed money from Robert McElevey and that he was to make a deed to Amanda, but that he did not name the amount. He testified thus: " He (Sankey), made the remark to me shortly after I took out letters of administration, that he had borrowed a certain amount of money, not naming the amount, from my brother, saying it was the desire of Robert that he should make the title to Amanda for the consideration of $825 or $850, he said to me for the lot, or the same amount which he claimed was bid off in Mercer County. Q. Robert McElevey was to have credit for it? A. Yes, sir. Q. With the amount? A. Yes, sir, it was $825.50 Mr. Sankey said to me that was to be the amount, that he was to deed the lot to Amanda for. Q. How did the amount come to be mentioned or alluded to in that conversation? How did he come to refer to the amount in dollars and cents? A. I don't recollect that that was the amount. He said he had borrowed some money from Robert not naming the amount. This was in 1849 and the deed was not made out for more than a year after that, and the deed was made in my presence to me and signed in my presence by his wife and him. I found the deed to be a thousand dollars, and I said to Mr. Sankey, ' This can not be possible, for I got information from you that it was to be $825 or $850 or whatever the amount was that was knocked down by the sheriff in Mercer county,' and I took exception to putting it at $1,000 at the time. He gave me no information at all. Q. Did he say anything about how much he got from Robert McElevey? A. No, sir, he never told me or any one else and I guess he didn't know himself."

In view of this testimony it is amazing that the plaintiff did not ask the defendant how much he borrowed from Robert. He gives no explanation of his omission to make this inquiry, nor does he at all allege that the defendant gave him any false amount as being the sum borrowed. Where, then, is the fraud? It was the right of the plaintiff to request and insist upon exact information, and if it was not furnished he could have commenced appropriate proceedings at once, when the facts were of recent occurrence and parties and witnesses were living. He knew the fact of indebtedness, for the defendant had himself informed him of it. He knew that the defendant alleged that the deed was to be made on account, or in payment of the debt, for that also the defendant told him. Yet he makes no further inquiry, though his attention was attracted to the subject of amount by a discrepancy between the sum named in the deed and a different sum which he said had been named by the defendant as the intended consideration. He

[Sankey *v.* McElevey.]

commences no proceedings but lies by for thirty-two years after the most material facts were disclosed to him by the defendant, and then brings suit because the amount of the loan, and the fact that a note had been given were not disclosed to him. Without any confidential relation existing between them, without any affirmative act of fraud or misrepresentation, without having parted with any property or right in consequence of any falsehood or deceit of the defendant, he now, after a delay of nearly a third of a century, seeks to compel the payment of a debt founded upon an ordinary loan of money, and in a common law action, by one who owed him no duty of information yet did inform him of every material fact which would have established his liability. The only omitted fact is one which would determine merely the pecuniary extent of the liability, but of that fact the plaintiff was necessarily put upon inquiry when the other facts were communicated to him. It is certainly not the law that one who is merely a debtor to another is bound to inform the creditor of the fact of the indebtedness. Nor if the creditor dies, does such a duty arise in favor of his legal representative. Hence, there is neither fraud nor breach of trust on the part of the debtor in failing to impart such information.

It was held in Barton *v.* Dickens, 12 Wr. 518, that the trusts not reached or affected by the statute of limitations are those technical and continuing trusts which are not cognizable at law, but fall within the proper and exclusive jurisdiction of a Court of Equity. On p. 523 AGNEW, J., said : " Analogies, if resorted to, are adverse to the opinion of the court below ; as where the fiduciary relation ceases to exist at a known period, or where the relation is such as to put the plaintiff upon inquiry and demand. Thus the right of action of a ward against his former guardian is barred after six years from his arrival at age." In Campbell *v.* Boggs, Id. p. 524, it was held that the statute of limitations begins to run in favor of an attorney in fact, and even of an attorney at law, for not paying over money collected, from the time of collection and not from the time notice is given of the receipt of the money.

It is true that where a plaintiff has been kept in ignorance of a cause of action by the actual fraud of the defendant, the fact of the fraud is a good reply to the plea of the statute. This was the case in Bricker *v.* Lightner's Ex'rs, 4 Wr. 199, where the defendant snatched the notes in suit from the desk of the deceased payee on the morning after his death, and thereby concealed the knowledge of them from his representative. It was the positive fraudulent act of the defendant which deprived him of the benefit of the statute. So also the mere fraudulent concealment of a cause of action by the debtor if it

[Sankey v. McElevey.]

be by means of an affirmative act may operate to prevent the bar of the statute. As in the case of Wickersham v. Lee, 2 Norr. 416, where the plaintiffs were misled by false information given them as to the collection of a claim which had been intrusted to the defendants. The plaintiffs had constantly applied for information and that which they received was not true in fact. In the opinion it was said: "So long as they (the agents) give him (the creditor) to understand that his claim is uncollected he is put off his guard. The duty of inquiry lies on him, but having made inquiry of his agents and being misinformed by them they cannot set up the statute, when they have misled him and thereby induced him to delay his action." The same doctrine is well illustrated in the case of Ferris v. Henderson, 2 Jones 49, where there was actual fraud and fraudulent concealment by means of false affirmation as to the plaintiff's condition of servitude, in consequence, and by means of which, he was deterred from bringing his action for many years, and it was held these facts constituted a good reply to the plea of the statute.

The subject of fraudulent concealment of a cause of action was very fully considered in the case of Troup v. Smith, 20 Johns. 33. It was there held that in an action of assumpsit for negligence, want of skill and fraud in the performance of work, the defendant having pleaded the statute of limitations, the plaintiff could not reply a fraudulent concealment of the badness of the work by the defendant so that the plaintiff did not discover the fraud until within six years of the commencement of the work, so as to deprive the defendant of the protection of the statute. The same rule was held in the cases of Smith v. Bishop, 9 Vermont 110 ; Fee v. Fee, 10 Ohio, 469 ; Allen v. Mills, 17 Wend. 202 ; Baines v. Williams, 3 Iredell 481. The doctrine is specially applicable in common law actions in which the courts hold themselves bound by the explicit provisions of the statute of limitations. But even in courts of equity we apprehend that there must be some relation of trust and confidence between the parties, imposing a duty to give information or some affirmative act of fraud, something more than mere silence, which will suffice to defeat the operation of the statute, where the basis of the reply to the statute is concealment of the cause of action. In the recent and very excellent work of Wood on the Limitation of Actions at p. 586, § 274, the subject of the effect of fraud on the operation of the statute of limitations is very fully and ably presented. He shows that in some of the states it is expressly provided by law that the fraudulent concealment of a cause of action shall be a bar to the running of the statute, except from the time of its discovery. As to these he says on page 590,

[Sankey v. McElevey.]

§ 276, " The provision that if a person liable to an action shall conceal the fact from the knowledge of the person entitled thereto the action may be commenced at any time within the period of limitation after the discovery of the cause of action, applies to causes of action for fraud, as well as to other causes of action ; but the concealment contemplated by the statute is something more than mere silence; it must be of. an affirmative character and must be alleged and proved so as to bring the case clearly within the meaning of the statute."

It was claimed as evidence of fraudulent concealment in the present case, that the defendant obtained possession of the note in suit from T. J. Power, who had it in custody in April, 1858, and that he concealed that fact from the plaintiff. The court below negatived the plaintiff's point upon this transaction, because. at the time it occurred, the claim was already barred by the statute, and the receipt given for the note contained no promise to pay the debt nor any recognition of the debt as an existing obligation. This ruling was in our opinion correct and disposes of that part of the plaintiff's case. In any event the note was not the cause of action. It was the mere evidence in one form of the fact which did constitute the cause of action, to wit, the loaning of the money. Of that fact the defendant did communicate knowledge to the plaintiff within one year after the death of Robert McElevey, the plaintiff's intestate. The plaintiff was beyond all question, thereby put upon inquiry as to the amount of the money loaned, the time and manner of its payment and of all material circumstances connected with the transaction. If he chose to neglect this duty of inquiry and suffer a delay of thirty years without invoking the aid of the law, he is not in condition to set up fraudulent concealment of the cause of action as a reply to the plea of the statute. The second, third, and fourth assignments of error are sustained and on them

The judgment is reversed.